### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**DAVID RAY WIDENER,**

      **Plaintiff,**

**v.**                                   **CASE NO. 2:11-cv-00670**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, David Ray Widener (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on April 28, 2008, alleging disability as of July 30, 2007, due to arthritis in spine, knees and hands, spurs in lower back, diabetes, high cholesterol, frequent headaches, constant pain in back, knees and legs, pain, stiffness and burning in both hands, and pain in left heal.  (Tr. at 24, 130-33, 134-40, 165-72, 189-95, 200-06.)  The claims were denied initially and upon reconsideration.  (Tr. at 74-78, 79-83, 90-92, 93-95.) On November 5, 2008, Claimant requested a hearing before an Administrative Law Judge

("ALJ"). (Tr. at 96.) The hearing was held on March 3, 2010 before the Honorable Rossana L. D'Alessio. (Tr. at 35-69, 104, 110.) By decision dated March 5, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 24-34.) The ALJ's decision became the final decision of the Commissioner on August 4, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On September 28, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§

2

404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 26.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of diabetes mellitus, obesity, and low back pain with multi-level degenerative changes with no evidence of neurologic compression.  (Tr. at 26-30.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 30.)  The ALJ then found that Claimant has a residual functional capacity for the full range of light work.  (Tr. at 30-33.)  The ALJ found that Claimant cannot return to his past relevant work.  (Tr. at 33.)  Nevertheless, the ALJ concluded that Claimant could perform jobs  which exist in significant numbers in the national economy and that a finding of "not disabled" is directed by Medical-Vocational Rule 202.21.  (Tr. at 33-34.)  On this basis, benefits were denied.  (Tr. at 34.)

3

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 44 years old at the time of the administrative hearing.  (Tr. at 38.)  He has a high school education with no special education services.  (Tr. at 207, 389.)  In the past, he worked as a meat cutter, stocker, cleaner and driver in grocery stores owned by his parents.  (Tr. at 38.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of

record, and will summarize it below.

<u>Physical Evidence</u>

On June 6, 1999, Claimant presented to the Braxton County Memorial Hospital with complaints of right wrist and forearm pain. (Tr. at 354-55.) A radiology report from John Anton, M.D. stated: "Films of the right wrist disclose no evidence of fracture or dislocation...Films of the right forearm disclose no evidence of fracture or dislocation...IMPRESSION: NORMAL EXAMINATION." (Tr. at 355.)

On June 26, 2000, Claimant received a gallbladder ultrasound and upper gastrointestinal x-ray at Charleston Area Medical Center [CAMC]. Johnsey L. Leef, M.D. reviewed the testing and found both to be normal. (Tr. at 227-31.)

On May 8, 2001, Claimant was given the procedures of esophagogastroduodenoscopy and biopsy at Thomas Memorial Hospital due to complaints of nausea and vomiting. (Tr. at 240.) Walter J. Zajac, M.D. stated: "Biopsy of mild gastritis, but otherwise no other problems...I am going to continue him on Nexium." (Tr. at 240-41.)

On June 10, 2001, Claimant was treated at CAMC Emergency Department for trauma to his left leg and left rib cage. (Tr. at 221-26, 232-34.) Attending physician, George Pullin, M.D. wrote:

> This is a 35-year-old white male who states that he was allegedly assaulted last evening by a policeman. This occurred at 23:00 last night. He states that he was driving his car through the neighborhood. He stopped at a friend's house and as he pulled into his friend's driveway, a policeman pulled up behind him with the lights flashing. The patient policeman apparently said that he was suspicious of drunk driving. Apparently, no breathalyzer was done. The patient states that he did have a total of six beers throughout the day yesterday, starting at 11:00 a.m. going until 11:00 p.m. last night. He did not have any more than that. He did not have any hard liquor or any illicit

drugs.  Apparently, the patient was then handcuffed and taken to jail last
night.  During the handcuffing, apparently, the policeman, used his baton to
strike the patient on his left out leg and his left anterior chest wall.  The
patient did not fall to the ground.  He did not have any shortness of breath.
He continues to not have any shortness of breath.  He has soreness today to
the anterior left ribcage area and to the left outer thigh.  He has noticed a
bruise that has developed to the thigh.  No bruising yet to the chest wall.  He
was urged to come to the Emergency Department from his lawyer to "get
checked out."  The lawyer was also requesting a serum alcohol level to be
drawn here in the Emergency Department today...

Laboratory/X-ray Results: A chest x-ray, urine macro and serum ethyl
alcohol level were obtained. Chest x-ray...no acute abnormalities. Urinalysis,
negative.  Serum ethyl alcohol, none detected...

It was discussed with the patient that he did not have any fractures at this
time.  His injuries were contusion type injuries.

(Tr. at 222-23.)

On June 12, 2001, Claimant was treated at Primary Care Systems/Big Otter Clinic

for injuries received when he was "[h]it by state trooper w/ [with] bully club 6-2-01 - large

bruise lateral lt [left] thigh...bruised area lt upper quadrant."  (Tr. at 317.)

On June 15, 2001, Claimant was treated at Thomas Memorial Hospital Emergency

Room for injuries he received in an assault:  Steven P. Rudis, M.D. stated:

This is a very pleasant 35-year-old gentleman who on Saturday, six days ago
was assaulted by someone who hit him with a pipe or bat.  He said he does
not want to give me any other details.  Was hit once in the chest and once in
the leg.  He said he went and saw his doctor on Tuesday and told him to take
Tylenol for the pain, but it is not helping.  He continues to have pain over the
left interior chest area.  No shortness of breath.  It is worse when he takes
deep breaths or moves.  He also has a large contusion over his left thigh.  The
police have been notified and contacted...

Patient was given Lortab 7.5 mg p.o.  A chest x-ray and left rib x-ray were
obtained and showed a seventh rib fracture...He is to followup with his doctor
next week or return if any problems.

(Tr. at 243-45.)

6

Between August 21, 2001 and December 15, 2008, Claimant was treated twenty-one times at Clay Primary Care Systems/Big Otter Clinic, by Angela Carter, FNP [family nurse practitioner], for a variety of reasons, including diabetes, morbid obesity, vomiting, nausea, lumbago, anxiety/depression, back pain, hematoma on buttocks, right wrist pain, flu vaccine, headaches, sore throat, runny nose, head congestion, medication concerns, and prescription refills.  (Tr. at 260-74, 282-83, 318-53, 375-76.)  Most of the handwritten records are illegible.  (Tr. at 318-37.) (Tr. at 260-74, 282-83, 318-37.)  Records show Claimant had multiple blood tests during this time period.  (Tr. at 275-81, 284-308.)

On November 2, 2001, Claimant was treated at Thomas Memorial Hospital for cholecystitis.  (Tr. at 246.)  Daniel Stickler, M.D. stated that Claimant underwent a laparoscopic cholecystectomy: "The patient tolerated the procedure well and was taken from the operating room in stable condition."  Id.

On October 3, 2005, Claimant had an MRI low back at Metro MRI with an admitting diagnosis of lumbago.  (Tr. at 248.)  Roland Edward Hamrick, Jr., M.D., surgeon, stated:

> IMPRESSION:
> 1.  At T11-2 and L5-S1 there are changes of disc degeneration and mild disc bulges.  No definite focal disc herniation.
> 2.  Nonspecific 5 cm soft tissue mass in the superficial fatty tissues of the lower back at the lumbosacral junction.  It is probably benign.  It may represent old hematoma and possibly scar tissue.  No enhancing lesion.  Correlation with clinical findings is advised.

(Tr. at 248.)

On November 11, 2005, Dr. Hamrick performed the following procedure on Claimant:

> Drainage of old hematoma on patient's back...status post ATV accident in 1994 who at the time suffered from a hematoma in his lower back.  The patient has had back pain ever since and presents today for removal of mass

7

on his lower back...

There was a large 5-6 cm cystic appearing mass on the patient's right lower back and a smaller appearing mass in the midline of the patient's lower back...All of this material was drained and copiously irrigated with saline...Skin incision was closed using skin staples.  The patient tolerated the procedure well and was sent to the Recovery Room in stable condition.

(Tr. at 249-50.)

On November 14, 2005, Telly M. Barreta, M.D., pathologist, reported that Claimant's hematoma back specimen was "benign."  (Tr. at 251.)

On November 19, 2005, Claimant was admitted to Charleston Area Medical Center [CAMC] under the care of Dr. Hamrick with a "wound infection."  (Tr. at 252.)  On November 21, 2005, Dr. Hamrick performed "further incision and drainage of the abscess on his back...The wound was then packed and left open...On postoperative day 2, the packing was removed, the wound was inspected...The cultures at that time were noted to be growing staph.   Antibiotics...and dressing changes with wound irrigation were continued."  Id.  Dr. Hamrick stated: "At this time, the decision was made to connect the incision in the right lower back with the incision in the midline."  (Tr. at 254.)    On postoperative day 7, November 28, 2005, Claimant was discharged.  Id.

On November 23, 2005, Mario T. Anselmo, M.D., pathologist, reported his diagnosis of the specimen from Claimant's right lower back: "Fragments of fatty tissue showing fat necrosis with old hemorrhage dystrophic calcification also noted."  (Tr. at 256.)

On January 11, 2008, Claimant had a CT scan of his brain performed at Braxton County Memorial Hospital due to a persistent headache.  (Tr. at 239, 356.)  Johnsey L. Leef, Jr., M.D. stated: "Routine brain CT performed with and without contrast material reveals no abnormality.  Impression: Normal study."  Id.

On January 28, 2008, Claimant had cervical spine x-rays at Braxton County Memorial Hospital. (Tr. at 238, 357.) Frank A. Muto, M.D. stated: "The prevertebral soft tissues are not thickened. Preserved vertebral height and alignment is noted. No facet hypertrophy or bony neural foraminal encroachment is identified…No acute osseous abnormality is demonstrated in the cervical spine." Id.

On February 5, 2008, Claimant had an MRI of his cervical spine per the order of Christine L. Jones, M.D. due to his complaints of headaches. (Tr. at 257.) Adam T. Krompecher, M.D. reported the following results: "No disc herniation is seen. IMPRESSION: 1. Exam limited by open scanning technique and patient motion. 2. Mild cervical spondylosis with no more than mild neural foraminal narrowing." Id.

On May 5, 2008, Claimant had x-rays of his dorsal and lumbar spine at Braxton County Memorial Hospital. (Tr. at 237, 259.) Johnsey L. Leef, Jr., M.D. stated:

> Dorsal Spine…Four view study reveals extensive degenerative change throughout the dorsal region most marked in its mid and lower portions. I see no evidence of fracture…
>
> Lumbar Spine…Six view study reveals surgical clips in the right upper quadrant…degenerative spurring at L4-5. Vertebral body heights, disc spaces and posterior elements appear intact.

Id.

On June 24, 2008, a State agency medical source attempted to complete a Physical Residual Functional Capacity Assessment. (Tr. at 309-16.) The evaluator, A. Rafael Gomez, M.D. stated Claimant's primary diagnosis was "[m]orbid obesity" and his secondary diagnosis, "DM [diabetes mellitus] type 2." (Tr. at 309.) Dr. Gomez concluded: "Examiner comment: please consider finding INSUFFICIENT EVIDENCE; claimant did not return forms, so no ce [clinical examination/evaluation] is being arranged. MER [medical

evidence of record] findings are provided by nurse practitioner.   INSUFFICIENT EVIDENCE TO ASSESS THIS CASE." (Tr. at 316.)

On August 12, 2008, Angela Carter, FNP [family nurse practitioner], completed a form titled "West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults), wherein she concluded: "42 year old male - x-rays of T spine on 5/5/08 show extensive degeneration.  L5 spine shows degenerative changes as well.  Newly diagnosed DM [diabetes mellitus]." (Tr. at 384.)

On August 14, 2008, Claimant had x-rays of his right and left knees at Braxton County Memorial Hospital.  (Tr. at 236, 358.)  James T. Smith, M.D. concluded: "Four views of the right knee disclose no evidence of fracture or dislocation...normal examination. Left knee...There is very minor hypertrophic spurring of the lateral aspect of the joint.  No bony injury or other abnormality is demonstrated...minor degenerative changes." Id.

On September 14, 2008, Claimant had an MRI scan of his lumbar and dorsal spines at Thomas Memorial Hospital.  (Tr. at 360-61.)  Ravindra Gogineni, M.D. concluded:

INDICATIONS FOR PROCEDURE:
Prior history of abscess, back pain

MRI SCAN OF THE LUMBAR SPINE
Vertebral body heights are preserved.  Alignment is normal.  No compression deformity is seen.   Mild disc desiccation noted at L4-5 and L5-S1 levels. Minimal bulging annulus is seen at L5-S1.  No discrete disc herniation is seen. No spinal stenosis is noted.  No discrete abscess identified.

Comparison is made with the previous study of 10/03/05.

IMPRESSION:
Disc disease at L4-L5 and L5-S1 levels.
Bulging annulus at L5-S1.
No compromise of the spinal canal.  No disc protrusion.

MRI SCAN OF THE DORSAL SPINE:

10

Vertebral body heights are preserved.  Alignment is normal.  Marginal spur formation noted at multiple levels.  At T11-12 level, there is a small disc protrusion.  T8-9 level, there is minimal marginal spur formation seen.  No significant cord compression noted.

IMPRESSION:
T11-12 small disc protrusion without significant cord compression.  Spur formation behind T9.

(Tr. at 360.)

On September 15, 2008, Quentin K. Tanko, M.D., Bone and Joint Surgeons, examined Claimant and concluded:

Very pleasant, 42-year old male who states approximately 10 years ago he noticed pain in his right wrist that moves into his thumb...

Assessment:
1. De Quervain's disease - 727.04 (Primary)
2. Carpal Tunnel Syndrome - 354.0
1) De Quervain's right wrist. 2) Carpal tunnel, right wrist.  3) Foreign bodies in his hand which are asymptomatic and not consistent with his above complaints.

Plan:
1. De Quervain's disease.
With patient's permission I will inject him with Depo-Medrol into his first dorsal compartment.  He will follow-up on an as needed basis.  I instructed him the next step for his carpal tunnel would be nerve conduction studies.  I advised him of the size of incision and that if pain in his hand gets much worse, he can contact me and I will take care of him.  He is also advised steroid injections in the carpal tunnel to provide relief 80% of the time, but that relief is short term less than 3-6 months.  We will see him back p.r.n.

Procedures:
1.  Under sterile conditions 40 mgs of Depo-Medrol, 1 cc of Lidocain, 1 cc of 1/4% Marcain injected.  The patient tolerated the injection quite well.  A band-aid was placed.

(Tr. at 377-78.)

On October 15, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment.  (Tr. at 362-69.)  The evaluator, James Engor, M.D. stated

11

Claimant's primary diagnosis was "morbid obesity, deg [degenerative] oa [osteoarthritis] / chronic arthralgia" and his secondary diagnosis, "diabetes, chol [cholesterol]." (Tr. at 362.) He found Claimant could do light work, could occasionally perform all postural limitations, had no manipulative, visual, or communicative limitations, and had no environmental limitations save to avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 363-66.) Dr. Engor concluded:

> He has diabetes, poorly controlled but no end organ damage noted to date; morbid obesity with BMI 40; arthralgias, deg [degenerative] oa [osteoarthritis] spine, no ROM in file but normal motor/neuro exams, gait normal and ADL [activities of daily living] mod [moderately] active.
>
> The complaints are regarded as not fully credible and the residual functional capacity is reduced to do only light work with some postural and environmental limitations as noted.

(Tr. at 369.)

On November 11, 2008, Robert J. Crow, M.D., neurologist, evaluated Claimant and concluded:

> Vital Signs
> Ht: 69 in. Wt: 287 lbs. P: 100 BP 117/76 mm Hg
>
> NEUROLOGIC EXAMINATION shows patient to be well developed, alert and oriented x 3 and in no acute distress. The patient is obese. The patient is comfortable. The gait is normal, with good toe and heel walking strength. Range of motion of the low back shows normal flexion and extension. There is no midline percussible pain, no trigger point or spasm. Straight leg raise and cross straight leg raise are negative. Motor exam is intact and symmetric in the bilateral lower extremities, with normal tone. Sensory examination is intact and symmetric in the bilateral lower extremities to pinprick and light touch. Deep tendon reflexes are intact and symmetric at the knees and ankles, without pathologic reflexes. Pulses palpable in both feet...
>
> IMPRESSION: Chronic low back pain with multi-level degenerative changes, no evidence of neurologic compromise.
>
> RECOMMENDATION: I discussed the situation with the patient. No

> indication for surgical intervention. Recommendations to the referring physician [Christine Jones, M.D./Angela Carter, FNP] would be physical therapy and pain clinic.

(Tr. at 372-73.)

On November 11, 2008, Claimant was treated at Kanawha City Urgent Care for "pain R [right] hand." (Tr. at 374.)

On December 20, 2008, an unsigned examination report states that Claimant's eyes were examined and that he had "[n]o diabetic retinopathy." (Tr. at 417.)

The records indicate that office treatment records from Big Otter Clinic dated February 23, 2009 were submitted into the record but the pages are unreadable. (Tr. at 418-20.)

On February 24, 2009, Frank A. Muto, M.D., Braxton County Memorial Hospital, stated in a radiology report: "LEFT SHOULDER...Three views of the left shoulder demonstrate no evidence of acute fracture, joint space narrowing or dislocation...WITHIN NORMAL LIMITS. CERVICAL SPINE...There is no evidence of acute fracture or dislocation. The joint spaces are preserved...WITHIN NORMAL LIMITS." (Tr. at 421.)

On July 22, 2009, Angela Carter, FNP, completed a West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults) form. (Tr. at 435-37.) Ms. Carter noted that Claimant stated his disability was "back pain, knee pain" and noted that his height was 68 inches, his weight 274 pounds, and his vison 20/15 without glasses in both his right and left eye. (Tr. at 435.) After the examination, she found Claimant to be "NORMAL" in all physical and psychiatric areas, save "orthopedic" due to "back pain, knee pain." (Tr. at 436.) Ms. Carter opined that Claimant was unable to work full-time at his customary work due to "unable to lift" and was unable to perform

13

other full time work because he "can't stand/sit long periods." Id.  Her "Summary of
Conclusions" stated: "C/O [complaints of] persistent back pain w/ [with] DDD
[degenerative disc disease] of spine.  Uncontrolled DM II [diabetes type 2].  Obesity."  (Tr.
at 437.)

On February 11, 2010, Frank Muto, M.D., Braxton County Memorial Hospital, stated
in a radiology report that four views had been obtained of Claimant's right and left knees
showing: "No acute osseous abnormality in the right knee...[or] in the left knee" and noted
that in both knees that there was no evidence of acute fracture, dislocation, malalignment,
or joint effusion.  (Tr. at 438.)

On February 24, 2010, Antoine Katiny, M.D., Braxton Imaging, Braxton County
Memorial Hospital, performed a nerve conduction study on Claimant to evaluate his upper
extremity symptoms for carpal tunnel syndrome. (Tr. at 439-42.)  Dr. Katiny concluded:
"Left and right median nerve conduction is within normal limits."  (Tr. at 442.)

On July 24, 2009, Claimant was treated at Clay Primary Care/ Big Otter Clinic for
a "routine visit."  (Tr. at 423.)  Angela Carter, FNP, noted:  "Doing well, needs strips and
needles refilled.  BS [blood sugar] running 140-160 at home...Well Groomed...f/u [follow
up] 3 mos [months]. "  (Tr. at 423-24.)

On September 15, 2009 and October 16, 2009,  Claimant was treated at Clay Primary
Care/Big Otter Clinic for a cold symptoms and "routine visit with labs." (Tr. at 429-30.)  Ms.
Carter noted Claimant was "well groomed."  (Tr. at 431.)

On January 7, 2010, Ms. Carter noted: "He is a 43 yr old male here for routine visit
and labs.  He is doing well, no problems, no refills needed." (Tr. at 433-34.)

On February 2, 2010, Ms. Carter noted: "C/O [complaints of] heartburn...gets reflux

after eating and when laying down...will try kapidex...low acid diet, cut carbonated beverages." (Tr. at 443-44.)

Psychological Evidence

On December 2, 2008, Paul Mulder, Ph.D., Psychologist, and Jerry Spiegler, M.A., Supervised Psychologist, completed a psychological evaluation of Claimant per a referral from Claimant's representative. (Tr. at 389-93.) They reached these conclusions:

> DIAGNOSTIC IMPRESSIONS:
> Axis I    296.21          Major Depressive Disorder, Single Episode, Mild
> Axis II  V62.89          Borderline Intellectual Functioning
> Axis III                       Degenerative Disc Disease, Hypertension, DM II, per
>                                    medical records
> Axis IV                       Chronic Health Problems, Social Isolation
> Axis V                        GAF=52
>
> SUMMARY AND CONCLUSIONS:
> David Widener is a nearly 43 year old divorced male living alone in a home owned by his parents. School records show that he graduated at the bottom 10% of his class having earned a 1.78 GPA. He was employed in his father's store. He was married for less than 2 years in the late 1990's, the relationship ended in divorce, and there were no children. Testing showed that Mr. Widener functions cognitively with the Borderline Range [WAIS-III results: Verbal IQ 79, Performance IQ 73, Full Scale IQ 74]. Degenerative Disc Disease, Type II Diabetes, and Hypertension are documented in the medical record.

(Tr. at 392-93.)

On December 15, 2008, Dr. Mulder and Mr. Spiegler completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities form. (Tr. at 394-99.) They marked that Claimant had no limitations in understanding, remembering, and carrying out instructions, save "mild" limitations in understanding, remembering, and carrying out detailed instructions. (Tr. at 395.) They opined he had "moderate" limitations in sustaining attention, concentration, persistence, work pace, and normal work schedules and

routines due to "Borderline Intellect." (Tr. at 395-96.) They found that he had no limitations in social functioning in a normal competitive work environment, except that he had "mild" limitations in maintaining acceptable standards of grooming and hygiene and in demonstrating reliability. (Tr. at 396.) They marked that he had no limitations regarding "adaptation in a work setting" and mild limitations regarding functioning independently in a competitive work setting, save for "carrying out an ordinary work routine without special supervision" which they concluded to be moderately impaired due to "Borderline Intellect." (Tr. at 397-98.) They found that Claimant had "moderate" limitations in the ability to tolerate ordinary work stress due to "Borderline Intellect & Mild Depression." (Tr. at 398.) They marked "Yes" to the statement: "Do you think that the impairments and limitations which you have identified have probably existed at their current level of severity since July 30, 2007, the alleged onset date?" Id.

On December 15, 2008, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 400-16.) The evaluator, Ray Milke, Ph.D., concluded that Claimant had a non-severe impairment for his affective disorder, depressive syndrome. (Tr. at 400, 403.) He found Claimant had moderate limitations regarding activities of daily living, maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation. (Tr. at 410.) Dr. Milke concluded that the evidence does not establish the presence of the "C" criteria and did not provide any comments. (Tr. at 411-12.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not consider Claimant's severe impairments of borderline intellectual functioning, major depressive disorder, hyperlipidemia, DeQuervain's Disease,

and gastritis/GERD/chronic abdominal pain, when making the determination of disability; (2) the ALJ did not properly evaluate Claimant's credibility and subjective complaints pursuant to SSR 96-7p; and (3) the ALJ erroneously relied upon the GRID rules to make a determination in a case involving numerous non-exertional impairments.  (Pl.'s Br. at 5-11.)

The Commissioner's Response

The Commissioner asserts that the ALJ's decision is based on substantial evidence because (1) Claimant failed to establish that he could not perform unskilled light work; (2) the ALJ was not required to uncritically accept Claimant's complaints and explained his reasons for finding those complaints not entirely credible; and (3) the ALJ was entitled to rely on the Medical-Vocational Guidelines because he limited Claimant to only light work. (Def.'s Br. at 7-17.)

Analysis

Severe Impairments

Claimant first argues that the ALJ did not consider Claimant's severe impairments of borderline intellectual functioning, major depressive disorder, hyperlipidemia, DeQuervain's Disease, and gastritis/GERD/chronic abdominal pain, when making the determination of disability.  (Pl.'s Br. at 5-7.)

The Commissioner responded that Claimant failed to establish that he could not perform unskilled light work, as unskilled work does not require a high degree of mental capacity; that Claimant's lack of a need for mental health treatment supported that he could perform unskilled work; that Claimant's physical examinations were generally normal and he failed to prove any impairment in his hands, lipids, or abdomen which were disabling.

17

(Def.'s Br. at 8-16.)

The five-step sequential evaluation process applies to the evaluation of both physical and mental impairments.  20 C.F.R. § 416.920a (a) (2006); 20 C.F.R. § 404.1520a (a) (2006).  In addition, when evaluating the severity of mental impairments, the Social Security Administration implements a "special technique," outlined at 20 C.F.R. §§ 404.1520a and 416.920a. Id.  First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1) (2010).  Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e) (2010).  Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2) (2010).  Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2010).  The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4)(2010).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2010). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2010).  Fifth, if a mental impairment

is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity.  §§ 404.1520a(d)(3) and 416.920a(d)(3) (2010).  The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described  in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

Claimant argues that the ALJ erred in concluding that his borderline intellectual functioning and depression were non-severe. (Pl.'s Br. at 5-7.) The court finds that the ALJ's decision reflects appropriate use of the "special technique," set forth above, to evaluate Claimant's mental impairments. (Tr. at 28-30.) In reaching his conclusion about the severity of those impairments, the ALJ expressly considered the history, including examination and laboratory findings, and Claimant's functional limitations, as required by the regulations. Id.  Furthermore, the ALJ's decision complies with the regulations in that it articulates a specific finding as to the degree of limitation in each of the functional areas:

> On the Disability Report-Adult, completed by the claimant at the initial determination level, he reported he graduated from high school; and did not receive special education services (Exhibit 2E).  School records from Clay County Schools show the claimant was never retained; received poor grades as he progressed in school; had a grade point average of 1.780; had excessive absences; and ranked 126 out of 141 students (Exhibit 10E).

> On December 12, 2008, Jerry Spiegler, M.A., supervised psychologist, and Paul Mulder, Ph.D., licensed psychologist, evaluated the claimant.  Mr. Widener reported that he graduated from high school; denied retentions in grade or receipt of special education services.  The claimant reported that he got married in 1998 and divorced in 1999.  Testing showed that the claimant's immediate memory and recent memory were within normal limits.  On the Wechsler Adult Intelligence Scale-III, the claimant attained the following IQs: Verbal IQ 79, Performance IQ 73, and Full Scale IQ 74, which were

considered valid.  On the Wide Range Achievement Test-III, the claimant's reading skill was at seventh-grade level; spelling was at third-grade level; and arithmetic was at fifth-grade level.  The claimant was diagnosed with borderline intellectual functioning (Exhibit 18F; page 15 to 19).

On the Function Report dated August 11, 2008, the claimant reported that he drives, talks on the telephone, pays the bills, manages his finances, uses a checkbook, and makes change (Exhibit 4E).  A vocational analysis dated October 15, 2008, shows the claimant's past relevant work as a butcher was skilled (SVP 6); this was confirmed by the impartial vocational expert at the hearing.

At the hearing, Mr. Widener testified he worked for himself at one time, driving a tractor trailer.  At the hearing, the vocational expert testified the claimant's past relevant work was skilled (SVP 6).  The claimant's earnings record shows consistent earnings for more than 20 years (Exhibit 4D, page 2).  Accordingly, it appears that borderline intellectual functioning is a medically determinable impairment.  The undersigned concludes the claimant's borderline intellectual functioning has resulted in no significant limitations because he worked for more than 20 years in skilled work with the impairment.  Therefore, borderline intellectual functioning is a non-severe impairment (20 CFR 404.1521, 416.921, and SSR 96-3p).

The record shows the claimant was diagnosed with and treated for depression and anxiety at Big Otter Clinic, his primary care provider in August 2004 (Exhibit 8F, page 12).  On April 15, 2005, the record shows the claimant's depression and anxiety is in remission (Exhibit 8F, page 13).  On December 12, 2008, Mr. Spiegler and Dr. Mulder noted the claimant's mood was mildly depressed and affect was mildly constricted.  The claimant was diagnosed with major depressive disorder, single episode, mild (Exhibit 18F, page 17).  On May 30, 2006, the claimant presented to Primary Care Systems requesting Lexapro (Exhibit 12F, page 19).  The record shows the claimant was diagnosed with depression and was prescribed Lexapro.  The claimant reported that he had been "off Lexapro for a while" (Exhibit 12F).  Accordingly this is a medically determinable impairment.  The undersigned finds the claimant's depression has resulted in no significant limitation in his ability to perform basic work activities and is, therefore, a non-severe impairment (20 CFR 404.1521, 416.921, and SSR 96-3p).

The claimant's medically determinable impairments of depression and borderline intellectual functioning, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

In making this finding, the undersigned has considered the four broad

functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B' criteria.

The first functional area is activities of daily living.  In this area, the claimant has no limitation.  On the functional Report dated August 11, 2008, the claimant reported that his daily activities include preparing meals, talking on the telephone, watching television, taking care of personal hygiene with some difficulty, doing laundry, mowing grass, sweeping, paying bills, managing finances, driving, and visiting his parents twice a week (Exhibit 4E).

The next functional area is social functioning.  In this area, the claimant has mild limitation.  On the Function Report dated August 11, 2008, the claimant reported he talks on the telephone and visits his parents twice a week (Exhibit 4E).  On December 2, 2008, Mr. Spiegler and Dr. Mulder noted mildly deficient social functioning (Exhibit 18F, page 17).  At the hearing, the claimant testified he talks to friends on the telephone and visits his parents.

The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitation.  On the Function Report dated August 11, 2008, the claimant reported that he drives, pays bills, and manages finances, all activities requiring concentration (Exhibit 4E).  On December 2, 2008, Mr. Spiegler and Dr. Mulder noted the claimant's attention and concentration were within normal limits as evidenced by Digit Span subscale score (Exhibit 18F).

The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended during in the fourth area, they are nonsevere (20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1)).

(Tr. at 28-30.)

Accordingly, the court proposes that the presiding District Judge find that substantial evidence supports the ALJ's finding that Claimant's borderline intellectual functioning and depression were non-severe.

21

Regarding Claimant's assertions that he also has the severe impairments of hyperlipidemia (high cholesterol), DeQuervain's Disease (hands), and gastritis/GERD/ chronic abdominal pain, the undersigned has thoroughly reviewed the medical evidence of record and finds that Claimant failed to show any functional limitations resulting from his hands, lipids, or abdomen that would prevent him from performing light work. With respect to the DeQuervain's Disease, this diagnosis was made on one occasion on September 15, 2008 by Quentin K. Tanko, M.D. (Tr. at 388-89.) Claimant did not return to this specialist and a nerve conduction study on February 24, 2010 by Antoine Katiny, M.D. to evaluate Claimant's upper extremity symptoms for carpal tunnel syndrome concluded: "Left and right median nerve conduction is within normal limits." (Tr. at 442.) Regarding stomach problems, the medical evidence of record shows that Claimant was treated conservatively and did not regularly take medication for these complaints. Regarding high cholesterol, hand pain, and heartburn, it is noted that Claimant's primary care nurse practitioner noted in Claimant's most recent treatment notes from January and February 2010 that Claimant was "doing well, no problems" with no mention of these allegedly "severe" impairments. (Tr. at 423, 433.)

Credibility

Claimant next argues that the ALJ did not properly evaluate Claimant's credibility and subjective complaints pursuant to SSR 96-7p. (Pl.'s Br. at 7-8.)

The Commissioner responds that the ALJ was not required to accept Claimant's complaints uncritically; the ALJ explained his reasons for finding those complaints not entirely credible. (Def.'s Br. at 15-16.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including

pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes, but is not limited to:

    - The medical signs and laboratory findings;

    - Diagnosis, prognosis, and other medical opinions provided    by treating or examining physicians or psychologists and    other medical sources; and

    - Statements and reports from the individual and from    treating or examining physicians or psychologists and    other persons about the individual's medical history,    treatment and response, prior work record and efforts to    work, daily activities, and other information concerning    the individual's symptoms and how the symptoms affect the    individual's ability to work.

The ALJ made these detailed findings regarding Claimant's credibility:

At the hearing, the claimant testified he sees a nurse practitioner at Big Otter Clinic for treatment of all of his medical problems.  Mr. Widener stated he worked for the family business, owned by his parents, for close to 25 years. He did everything except office work or running the cash register.  He worked as a meat cutter; he did mowing, stocking, cleaning, mopping, and sweeping. The claimant stated he worked for himself driving a tractor trailer for a while. Mr. Widener testified he has back pain as a result of a motor vehicle accident and a back injury.  He stated he has pain in his lower back, neck, and leg pain. The claimant stated his biggest problem working was standing on concrete

and working in the cold, damp meat shop.  Mr. Widener testified he had difficulty getting in and out of his truck after driving for ten hours.  On a scale of zero to ten, the claimant stated his back pain is seven or eight most of the time.  He is unable to stay in one place for prolonged periods.  The claimant testified he can sit for 25 to 30 minutes before needing to change positions; stand for eight to ten minutes; walk on level ground for 20 to 25 yards; drive for 20 minutes; and can lift a case of water.  The claimant stated he takes Tylenol and Advil, takes hot showers, and changes position to treat his pain.  The claimant testified he "tries to follow a diet" for diabetes.  Mr. Widener stated he sees his parents on a regular basis and talks to friends on the telephone.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant has not provided convincing details regarding factors which precipitate the allegedly disabling symptoms, claiming that the symptoms are present "constantly" or all of the time.  Treatment records show the claimant reported he was "doing well" (Exhibits 9F, 23F, page 2 and 24F, page 6).

The record reveals that the claimant's borderline intellectual functioning was present at approximately the same level of severity prior to the alleged onset date.  The fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work.

There is evidence that the claimant was not entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application.  On January 10, 2008, the record shows the claimant stopped taking Glucophage (Exhibit 8F, page 9).  On January 25, 2008, the record shows the claimant was taking "no medications now" (Exhibit 8F).  On December 20, 2008, the claimant reported to Dr. Cline that he will "start Lipitor and Glucophage" (Exhibit 10F).

Although the claimant has received treatment for the alleged disabling impairment, that treatment has essentially been routine and/or conservative in nature.  On November 11, 2008, Robert Crow, M.D., noted the claimant has had rest, medications, and no other formal intervention.  The claimant does not desire surgery (Exhibit 16F).  In regard to his depression, the claimant has never sought or received treatment from a specialist; all

> treatment has been rendered by a general practitioner (Exhibit 8F).
>
> As discussed previously in the decision, Mr. Widener reported that his daily activities include preparing meals, talking on the telephone, watching television, taking care of personal hygiene with some difficulty, doing laundry, mowing grass, sweeping, paying bills, managing finances, driving, and visiting his parents twice a week (Exhibit 4E).  The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

(Tr. at 30-31.)

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause his alleged symptoms. (Tr. at 31.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication.  Id.  The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. Id.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court proposes that the presiding District Judge find that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Medical-Vocational Guidelines (Grids)

Claimant next argues that the ALJ erred in relying upon the Grid rules to make a

determination because there were non-exertional impairments:

> Although a VE was present at the hearing, the ALJ utilized her only to define the exertional level and transferability of skills of Plaintiff's past relevant work - heavy to medium with no transferable skills. The VE concluded that Mr. Widener could not return to his past relevant work if he were reduced to work at the light level. Utilizing the Grid Rules, the ALJ determined that Claimant was not disabled. No jobs were identified. The ALJ merely made a blanket determination that claimant could engage in work at the light exertional level...

> In the five step process governing SS disability claims, the claimant bears the burden of proof for steps one, two, and four. If the ALJ determines claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. The Commissioner bears the burden of proof at the last step...

> Complaints of back pain, wrist pain, arm pain, headaches, leg pain and knee pain are predominant throughout claimant's medical record. Objective evidence of impairments that could reasonably be expected to produce pain is in the record. Moreover, and very importantly, claimant is low functioning and suffers from major depressive disorder. A further crucial consideration is whether claimant could perform work in the national economy. It cannot be overlooked that he is a limited individual who has sustained employment, to this [sic, his] credit and that of his family, only in a family owned and ran business. Whether he could function in a normal work-setting was not explored and is an obvious issue in the determination of disability. The effect of these type non-exertional impairments cannot be measured by a table that takes into consideration only very limited and concrete factors.

(Pl.'s Br. at 8-11.)

The Commissioner responds that the ALJ was entitled to rely on the Medical-

Vocational Guidelines because he limited Claimant to light work:

> The regulations provide that the Grids will be applied where an individual is limited to only unskilled work with limitations in strength demands (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grids directed a finding of "not disabled" based on Plaintiff's young age, high school education, previous work experience that was skilled or semiskilled but not transferable, and ability to perform unskilled, light work. 20 C.F.R., pt. 404, subpt. P, app. 2, § 202.21. Administrative notice has been taken that other work exists in significant numbers in the national economy where the factors coincide with the Grid

rule.  See id. § 2000.00(b).

The ALJ considers other vocational evidence, such as the testimony of a vocational expert or the Dictionary of Occupational Titles, only when an individual has additional limitations preventing him from performing the basic mental demands of unskilled work and the limited physical demands of light work.  See 20 C.F.R. §§ 404.1569a(d), 416.969a(d); SSR 96-9p, 1996 WL 374185, SSR 96-9p, at *9.  Because the ALJ found no additional limitations(and no additional limitations were supported by the record...), he was entitled to rely on the Grids.  Plaintiff fails to identify any additional limitations that would prevent him from performing unskilled, light work. Instead, Plaintiff identifies only impairments (Pl.'s Br. at 10).  But the existence of a diagnosis, without establishing specific functional loss, is insufficient to prove disability.  See Gross, 785 F.2d at 1166.

In sum, because Plaintiff failed to meet his burden of proving that he did not have the functional capacity to perform light, unskilled work, the ALJ's decision should be affirmed.

(Def.'s Br. at 16-17.)

The sequential steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.  In the subject claim, the ALJ stated:

At the last step of the sequential evaluation process (20 C.F.R. §§ 404.1520(g) and 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 C.F.R. §§ 404.1512(g), 404.1560(c) 416.912(g) and 416.960(c)).

(Tr. at 26.)

The ALJ made these findings:

27

**6.  The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965.**

The claimant has past relevant work as a butcher and stock/cleaner.  Lisa Goudy, an impartial vocational expert, described the claimant's past relevant work as a butcher as skilled (SVP 6) and performed at heavy exertion; and stock/cleaner as performed at heavy exertion.  Accordingly, the claimant is unable to perform past relevant work.

**7.  The claimant was born on January 30, 1966, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).**

**8.  The claimant has a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).**

**9.  Transferability of job skills is not material in the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).**

**10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-111).   When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Based on a residual functional capacity for the full range of light work,

considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.21.

(Tr. at 33-34.)

Contrary to Claimant's assertion, the ALJ did not "overlook" that Claimant is a "limited individual who has sustained employment...only in a family owned and ran business." (Pl.'s Br. at 11.)   The ALJ noted that Claimant had worked for "the family business...for close to 25 years" and noted that "Claimant's borderline intellectual functioning was present at approximately the same level of severity prior to the alleged onset date.  The fact that the impairment did not prevent the claimant from working at the time strongly suggests that it would not currently prevent work."  (Tr. at 31.)  The ALJ explained in his decision: "Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. §§ Part 404, Subpart P, Appendix 2)."  (Tr. at 33.)

With respect to Claimant's argument that the ALJ wrongfully applied the Medical-Vocational Guidelines to support a finding of "not disabled", the court proposes that the presiding District Judge find that the ALJ properly considered Claimant's residual functional capacity for a full range of light work, his age, education, and work experience in conjunction with the Medical-Vocational Guidelines, to conclude there are jobs that exist in significant numbers in the national economy that Claimant can perform per Medical-Vocational Rule 202.21.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS**

this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  June 19, 2012  
    Date

Mary E. Stanley
United States Magistrate Judge